UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

| | |
|---|---|
| **SENS INC., *et al.*,**<br><br>        Plaintiffs<br><br>v.<br><br>**WHITEFORD, TAYLOR AND PRESTON, L.L.P., *et al.*,**<br><br>        Defendants | **Case No.  20-00149** |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT</u>

Defendants, Whiteford, Taylor and Preston L.L.P. (hereinafter "WTP") and Thomas C. Beach III (hereinafter "Mr. Beach") (collectively "Defendants"), by their attorneys, Alvin I. Frederick, Lauren E. Marini, and Eccleston and Wolf, P.C. and Kevin G. Hroblak of Whiteford, Taylor & Preston L.L.P., move this Court to dismiss all claims brought by Plaintiffs Sens, Inc., Roy Sens, Melanie Sens, and Sens Mechanical, Inc. with prejudice. Alternatively, Defendants respectfully request that the Court grant summary judgment in their favor as to all claims. In support, Defendants state as follows:

### INTRODUCTION

Sens, Inc. ("Sens") entered into a contract with Inns of Ocean City ("IOOC" or "Owner") to build an 18-million-dollar hotel in Ocean City, Maryland. Sens, through its own negligence and prior to any involvement by Defendants, agreed to a construction contract without reviewing final plans that obligated Sens to construct the building at a fixed price with no additional consideration, notwithstanding that Sens had not seen the final building plans and requirements for the building were not yet finalized. Sens waited until *after* the date of substantial completion

for the project had passed and it was incurring daily liquidated damages in the amount of $9,500 for its failure to timely complete the building before retaining Defendants. Thereafter, *against the advice of Defendants*, Sens remarkably then relinquished and waived any ability to assert a claim or defense relating to its nonperformance due to the Owner's failure to provide plans and construction permits when it executed a change order containing such a release. Sens thereafter faced a situation entirely of its own making where it could either continue the Project at a substantial loss in light of the ongoing liquidated damage assessments it agreed to, or it could stop work on the Project.

Sens chose the latter as its owner viewed completion of the Project to be "impossible." Plaintiffs now seek to blame Defendants for their own "horrible" choices, failing to recognize that, Sens signed the contract without any involvement of Defendants, performed poorly such that it defaulted and suffered massive liquidated damages before contacting Defendants, signed a release and change order against the advice of Defendants, still could not perform as required under the contract, were unable economically to sustain a loss under the contract to complete the Project, and constructed the building in an unworkmanlike manner requiring the building owner to incur almost as much as the initial contract to fix the problems. As a result, Plaintiffs simply cannot establish that Defendants caused any harm.

In addition, subsequent to the Plaintiffs incurring liability for their failed performance, Sens Mechanical, Inc. and Mr. and Mrs. Sens filed for bankruptcy protection. Notably, none of them listed as an asset any claim against Defendants. Moreover, Mr. and Mrs. Sens did not disclose any claim of value related to their 100% ownership interest in Sens, Inc., including any claim against Defendants. Because the claim they now bring arose prior to the filing of their bankruptcy cases, only their trustee in bankruptcy has standing to pursue these claims, not the

Plaintiffs themselves. Further, because they obtained a discharge from their debts owed to creditors, and they failed to disclose the claims they now bring, they are judicially estopped under well-established law from pursuing the claims even if they had standing. For all of the reasons set forth herein, Plaintiffs are unable to assert any claim against Defendants and this matter should be dismissed, in its entirety, with prejudice.

## STATEMENT OF UNDISPUTED FACTS

This case arises out of a contract between IOOC and Sens, Inc. to build a Marriott Residence Inn Hotel located at 300 Sea Bay Lane, Ocean City, Maryland, a 150-unit, eight story hotel (the "Project"). Compl. at ¶ 9.

**A.      The Contract.**

Sens first became aware of the Project in 2013-2014, through its former President, Dave Rainey. *See* Deposition of Roy Sens attached hereto as **Exhibit 1** at 127:11-128:2. After a few meetings with IOOC, where drawings only consisting of 30 percent of the building were presented, Sens executed the contract on June 9, 2014. *See id.* at 129:07-130:21; *see also* Job Contract attached hereto as **Exhibit 2**. Messrs. Sens and Rainey reviewed the contract prior to execution without any involvement by Defendants. *See* **Exhibit 1** at 138:20-139:1; 144:7-145:6.

Sens anticipated an approximately eight percent profit from the job (or $1.4 million). *See id.* at 160:10-16. In Article 3.4 of the contract, Sens agreed to pay liquidated damages in the following amounts: (a) $3,000 per day for each day of the first fifteen days [past the date of substantial completion].... (b) $6,000 per day for each day of the next fifteen days.... and (c) $9,500 per day from the 31st day past substantial completion." *see* **Exhibit 2** at Article 3.4; *see also* **Exhibit 1** at 142:20-143:1.

Sens and IOOC divided the Project into two phases. *See* Compl. ¶ 10. The first phase, with a contract price of approximately $1.4 million dollars, entailed laying the foundation and pouring the concrete for the high-rise hotel. *Id*. On March 16, 2015, the contract was amended to include the second phase of the work, construction of the hotel, at a complete contract price of $17.8 million dollars (an amount which included the phase one foundation and concrete work) (the "Amended Contract"). *Id.* at ¶12.  Sens and IOOC agreed to a date of substantial completion of March 30, 2016. *See* First Amendment to Contract and Exhibit I (the "Amended Contract"), attached hereto as **Exhibit 3**.

The Amended Contract included Exhibit I, which states: "Contractor and Owner each recognize and agree that the drawings and specifications are incomplete or inaccurate in a number of respects and include omissions and deficiencies… [t]he parties are willing to proceed with the construction of the Project, <u>even with the understanding and acknowledgment that the drawings are incomplete, inaccurate, lacking details and include deficiencies, errors, and omissions….all work necessary to implement the above at no additional cost, expense, or charge to the owner</u>." *See Id.* (emphasis added).    Neither Defendants nor any other lawyer reviewed the Amended Contract (or Exhibit I) before Mr. Rainey executed it. *See* Deposition of Dave Rainey attached hereto as **Exhibit 4** at 253:2-15; 245:12-247:1.

Roy Sens testified that Exhibit I was a "horrible document," which made the job impossible by obligating Sens to construct a building according to unfinished and unknown design without the possibility of additional compensation. *See* **Exhibit 1** at 282:22-284:10.

As set forth below, IOOC repeatedly relied on the language in Exhibit I to deny Sens' requests for change orders for extensions of time, and in defense to Sens' allegations that IOOC provided deficient and untimely design documents. *See* Letter from IOOC to Sens dated 8/3/16

attached hereto as **Exhibit 5**; *see also* **Exhibit 1** at 185:18-185:5. Despite this, Sens, against the advice of counsel, agreed to Change Order 12 discussed *infra*, which reinforced and confirmed the already unfavorable provisions of Exhibit I.

### C.    The Bonds

After the Amendment, IOOC and the bank required Sens to secure payment and performance bonds on the Project. *See* Compl. ¶ 12. However, Sens' finances were not in a position to secure a $17.8 million bond on its own. The bonding company noted that Sens had a "negative working capital and negative net worth" at the time they applied for the bonds. *See* Deposition of William Sohn attached hereto as **Exhibit 6** at 11:1-19; 57:8-20. William Sohn testified that "the financial position of the company [Sens] was distressed," due to "negative working capital, negative net worth, [and] distressed financial position." *Id.* at 18:14-19:2. Moreover, Roy Sens had no "secondary assets" which would be available to pay bills. *Id.* at 58:4-20. The Surety stated, "based on the financial position, [we are] not certain how they maintain operations." *Id.* at 18:8-17. Accordingly, Sens was required to provide additional indemnitors in order to qualify for the bonds.  Compl. ¶ 13.

On or about June 19, 2014, bonds were issued in the amount of $17,850,000.00.  *See id.* at 14. The co-indemnitors on the Bonds include Roy and Melanie Sens individually, Sens Mechanical, Inc., Daniel Burt and his wife, individually, and 1111 Edgewater Condominium, LLC, a company owned by Daniel Burt and his wife. *Id.*

### D.    Sens' Performance.

Sens and Burt began work on the Project, which was to be run on a Critical Path Management (hereinafter "CPM") basis, meaning that items critical to completion of other aspects of the job are performed first.  Sens had never prepared or operated under a CPM

schedule before. *See* **Exhibit 1** at 64:12-21.From the very start, the Project fell behind, which Sens contends was a direct result of IOOC's failure to provide the necessary drawings and plans for the construction. Compl. ¶ 15.

Despite the fact that work was behind, Sens and its subcontractors did not employ adequate manpower to catch up. Mr. Sens testified that "delays in the completion of the concrete structure were solely due to [Sens's] lack of manpower" and that "Burt was detailing resources to other projects in Ocean City . . . instead of putting more staff personnel on the Residence Inn project." *See* **Exhibit 1** at 241:8-15. Moreover, Mr. Sens testified that Sens did not accelerate its work schedule or operate under a "double schedule" in order to catch up. *See id.* at 229:16-230:4; *see also* **Exhibit 2** § 8.2.3 ("Contractor shall employ such additional forces, obtain such additional equipment… and pay such additional overtime wages as may be required to bring the progress of the Work back into conformity with the Construction schedule").

The date of substantial completion set forth in the Contract was March 30, 2016. As early as August 11, 2015, IOOC was aware of significant delays on the Project and was threatening to take action. Barry Gosnell, president of IOOC threatened to involve the bonding company if Sens did not get on track. *See* August 11, 2015 Email attached as **Exhibit 7**.As of February 2016, Mr. Gosnell estimated that there was a 98-day delay on the project. *See* Deposition of Barry Gosnell attached as **Exhibit 8** at 31:24-32:24.

Sens claimed that IOOC did not provide plans or permits, and failed to answer Requests for Information. When Sens attempted to obtain change orders for extensions of time, IOOC relied on Exhibit I to deny those requests. Mr. Sens testified that, "they knew **it was impossible for me to build that. No one could have built it, as we know.  As we know, no one could**

**have built it. So this was designed for failure**, from owner to me. **This – this document [exhibit I] was designed to make me fail.**" **Exhibit 1** at 185:10 to 186:17. (emphasis added).

On January 28, 2016, IOOC sent a letter to Sens, which stated, "the owner has significant concerns regarding the timely completion of the Project, and requests that Sens take immediate action to cure any issues that are impacting and delaying the Project . . . . The most recent schedule provided by Sens contemplates that Substantial Completion will not be achieved until May 24, 2016. . . . . Be advised that the Owner is prepared to assess and withhold liquidated damages in accordance with Section 3.4 of the Agreement, should Sens fail to achieve Substantial Completion by the agreed date." *See* January 28, 2016 letter to Sens attached hereto as **Exhibit 9**.

In April 2016, *after* the March 30, 2016 date of substantial completion had passed, Sens had a meeting with Mr. Gosnell, during which Mr. Gosnell insisted that he was going to hold Sens to the deadlines set at the beginning of the project. After that time, and only after the date of substantial completion had passed and Sens was already incurring liquidated damages under the Contract, Sens hired Defendants. *See* Compl. ¶ 18.

On May 19, 2016, Sens sent a letter to IOOC informing them that it was suspending all work on the Project due to a lack of final drawings, executed change orders, payments, and the impending prospect of liquidated damages. *See* May 19, 2016 letter attached hereto as **Exhibit 10.** The letter stated that the impending May 30th date of Substantial Completion "from which [the owner] intends to calculate LD's is an untenable position for the Owner and we have requested many times that you waive all liquidated damages claims, supply the missing documentation and permits, and establish a realistic completion date to be incorporated into the contract documents, so that the contract, as amended, reflects the facts at hand. You have refused

to do so. Your reliance on 'Exhibit I' in refusing Change Orders is based on a complete misconstruction of the language of [the] Exhibit." *Id.*

On June 6, 2016, IOOC wrote to the Surety in a General Status Inquiry that the "job is way behind schedule" and that Sens's performance was "late and disappointing" due to "project management deficiencies, scheduling and reporting deficiencies, and other contractual deficiencies." *See* General Status Inquiry attached hereto as **Exhibit 11**. Furthermore, IOOC was assessing substantial liquidated damages against Sens. *See* Compl. at ¶ 17.  For example, on June 16, 2016, Sens's Application for Payment was approved for the amount of $1,124,579.35; however, $135,000.00 (approximately 12%) was deducted in liquidated damages. *See* Application for Payment attached as **Exhibit 12**.

**E**.     **Change Order 12**

After Sens's May 19, 2016 letter, IOOC and Sens began negotiating an extension to the date of substantial completion, in order to try and resolve their dispute over liquidated damages. IOOC proposed a change order which extended the date of substantial completion 61 days to May 31, 2016. The proposed change order, in addition to extending the date of substantial completion, reaffirmed those provisions set forth in Exhibit I, requiring Sens to agree to "expressly and unconditionally waive…. And forever discharge owner… from any and all claims, demands, request for additional time or costs associated with any additional time including, but not limited to, general conditions and fee arising out of, or in any way connected with any known as of the date of the execution of the change order associated with this exhibit alleged errors, omissions, or other general deficiencies in the design documents supplied by the Owner to the Contractor for the Project." *See* Change Order # 12 attached hereto as **Exhibit 13**. The Change Order expressly stated that "nothing in this Change Order No. 12 shall act as a

8

<u>waiver or release of Owner's right to assess liquidated damages should the Contractor fail to</u>

<u>achieve substantial completion on the Project by May 31, 2016</u>." *Id.*

On June 2, 2016, Mr. Rainey emailed Mr. Beach a copy of Change Order 12 stating, "as an update, we have resolved our differences on the Change orders and the owner has given us a 62 day time extension to date with the carrot that if we hit certain other dates they will consider further time extensions. The bonding company has stated they want us to finish.  Attached is a new exhibit that the owner has generated on the time extension. We have marked up our feelings do you have any comments. We are trying to get resolved asap so we can get paid." *See* June 2016 Email thread attached as **Exhibit 14**.

On June 2, 2016, Mr. Beach responded stating: "**<u>I am not satisfied with the document.</u>** **<u>On my calendar 31 May was last Monday.  What about the elephant in the room, the</u>** **<u>missing plans, specs, and permits? No [liquidated damages] until a new completion date</u>** **<u>some reasonable time after receipt of missing documents and permits. No waiver of Sens</u>** **<u>rights. Stop work until resolved. You are being played.</u>**" *Id.* (emphasis added).

After receiving Mr. Beach's clear and unequivocal warning, and against Mr. Beach's advice, on June 9, 2016, Mr. Sens executed Change Order 12.  Change Order 12 was executed by Sens, approximately 10 days *after* the new date of substantial completion set forth in the document. Mr. Sens testified that he knew that Sens was not going to be able to finish the project by May 31, 2016 (a date which had already passed when he signed the Change Order), yet he still signed the document. *See* **Exhibit 1** at 255:19-21.

**F.     Termination**

The parties continued discussions regarding the Project, and following a meeting between Sens and Gosnell where Gosnell informed Sens that he was going to let him finish the job. Sens

responded by saying he could only finish it with plans, the RFI's (Requests for Information) and permits. Gosnell informed Sens that he was going to impose liquidated damages, to which Sens replied, "it would be impossible for me to do this job if you take over a million dollars from me." *Id.* at 197:17-21.

Plaintiffs were facing a situation entirely of their own making. They could continue the job while continuing to incur liquidated damages, which Mr. Sens testified would be "impossible," or they could leave the job. On July 28, 2016, at the direction of Plaintiffs, Defendants sent IOOC a Notice of Noncompliance, which Mr. Sens later described as Sens's attempt to try and "convince [IOOC] to pay more." *See id.* at 200:7-20. The Notice outlined the reasons that Sens believed IOOC was not in compliance with the contract, including that it was missing and/or had incomplete design documents, permits, approvals, and drawings. *See* Notice of Noncompliance attached hereto as **Exhibit 15**. On August 2, 2016, Sens walked off the job.[1]

On August 4, 2016, IOOC sent a letter to the Surety notifying them of Sens's default and their intent to terminate Sens for cause. Subsequently, there was an "effort in that period of August 2016 to put the team back together again" to "see what we can do to get this worked out" led by Richard Klein, a representative of the Surety. *See* **Exhibit 1** at 202:14-202:21. As required by the General Indemnity Agreement, the Surety, IOOC, and Sens met on August 18, 2016 at Defendants' office. *See* Compl. ¶ 27; *see also* **Exhibit 1** at 207:5-17. On August 30, 2016, IOOC notified Sens that it was terminating their right to perform further work on the project for cause, due to Sens's abandonment of the job, refusal to supply skilled workers and proper materials, failure to make prompt payment to subcontractors, breach of contract, and failure to maintain the

---

[1] At the time that Sens walked off the job, IOOC had paid $13,376,085. *See* Affidavit of Patrick Laverty attached hereto as **Exhibit 16** at No. 10.

project schedule. *See* Compl. at ¶ 29; *see also* Notices of Intent to Terminate attached hereto as **Exhibit 17**.

### G.    Bond Claim, Takeover Agreement, and Completion

After terminating Sens's right to perform further work, IOOC made a claim against the Performance Bond demanding that the Sureties perform Sens's remaining obligation under the contract. Compl. ¶ 29.  On November 22, 2016, the Sureties and IOOC entered into a Takeover Agreement whereby the Sureties, through Whiting-Turner, fulfilled Sens's obligations under the performance bond. *See* Compl. ¶ 25. Mr. Sens testified that when Sens left the job, it was approximately 80-90 percent complete. *See* **Exhibit 1** at 198:3-10.

Despite Mr. Sens's contention, in completing the Project, Whiting Turner discovered significant construction defects, requiring substantial additional work to complete the job. Robert Saxman of Whiting Turner testified that "after having toured the job, it was obvious to ourselves and to Richard Klein that there were extensive issues with the construction of the project."  *See* Deposition of Robert Saxman attached hereto as **Exhibit 18** at 39:11-20.. As Whiting Turner began completion of the Project, "it became more and more clear, that the level of defect in construction was extensive and some of it was hidden." *Id*. at 65:8-11. The defects included extensive mechanical issues, inadequate firestopping, improper concrete in the stairwells, and walls not wide enough to meet code. *Id.* at 42:10-44:5; 68:5-11, 78:10-22.

In addition, "there were certainly parts of the work not done. The site work was largely undone. There was lots of work on the pool. The whole exterior pool/tiki bar area had barely started. There were issues in quality in drywall. There were issues in some of the concrete work in the stairwells. [Whiting Turner] had been informed that the walls—the stairs were not wide enough to meet code." *Id*. at 43:6-43:14. Sens's deficient and incomplete work caused the

"exorbitant costs" as alleged in the Complaint. *See* Compl. ¶ 35. By way of illustration, due to mechanical and ductwork issues, much of the lines had to be replaced. As a result, "almost all the ceilings in the hallways had to be removed to access those lines and reinsulate." **Exhibit 18** at 74:3-16.The deficient work performed by Sens caused the Surety to expend close to $16 million to complete a job that Sens claims was 80 to 90 percent completed and had a contract price of $17.8 million. *See* **Exhibit 16** at No. 20.

### H.  Subsequent Lawsuit

On or about December 21, 2016, the Sureties filed a lawsuit against Sens and the other indemnitors in the Circuit Court for Baltimore County, Maryland seeking damages in the amount of $17,575,838.84.  *See* Compl. ¶ 37.  On December 18, 2018, the Circuit Court for Baltimore County granted summary judgment in favor of the Sureties.

### I.    Sens Mechanical, Inc., Roy Sens, and Melanie Sens Bankruptcies

#### (i)    Sens Mechanical Bankruptcy

On August 11, 2017, Sens Mechanical filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Maryland. *In re Sens Mechanical, Inc.*, Case No. 17-20880. The case was subsequently converted to a Chapter 7 proceeding. On August 25, 2017, Sens Mechanical filed "Schedules A-F." Schedule A/B which covers property of the debtors required Sens Mechanical to list any "causes of action against third parties (whether or not a lawsuit has been filed)."   Sens Mechanical answered the question under penalties of perjury "no."  Case No. 17-20880 ECF 17 at p. 7. A copy of Sens Mechanical's schedules is attached hereto as **Exhibit 19**. The schedules did not identify any claim against Defendants. On December 1, 2017, Sens Mechanical amended its schedules; however, the claim now asserted against Defendants was not listed.  A copy of the Amended Schedules is attached hereto as **Exhibit 20**.

A Final Decree was entered by the Bankruptcy Court on August 14, 2019, and Sens Mechanical never once disclosed the existence of any claim against Defendants prior to obtaining the Final Decree.

### (ii)    Roy and Melanie Sens Bankruptcy

On June 21, 2017, Roy and Melanie Sens filed for personal bankruptcy under Chapter 7 of the Bankruptcy Code, *In re Roy Sens and Melanie Susan Sens*, Case No. 17-18481. Schedule A/B, which covers property of the debtors, required the Sens to list any "[c]laims against third parties, whether or not you have filed a lawsuit or made a demand for payment." The Sens answered the question under penalties of perjury "no." Case No. 17-18481 ECF 3-1 at p. 15. Importantly, they also scheduled their 100% ownership interest in Sens and valued the company at $1, even though they now suggest Sens has a valuable claim against Defendants. *Id*. at p. 12. A copy of their Voluntary Petition and Schedule A/B are attached hereto as **Exhibit 21**.[2]

During the pendency of the bankruptcy, the Sens amended their schedules a total of three times, once listing all litigation in which they were involved, however, they never disclosed or identified any claim or potential claim against Defendants. A copy of the Amended Schedules A/B are attached hereto as **Exhibit 22**. Mr. and Mrs. Sens eventually settled with the Trustee by paying the bankruptcy estate $64,402.50, the total value of non-exempt assets listed on their Amended Schedules, to effectuate their discharge of debts. *See* Settlement Agreement attached hereto as **Exhibit 23**. On November 16, 2017, based on the information disclosed and assets administered by the Chapter 7 Trustee, which did not include the claims against Defendants, the Sens obtained a discharge on their debts. More than two years later the Sens asserted claims

---

[2] The Court may take judicial notice of the docket and certain filing in another case when done so in furtherance of a just result. *Cochran v. Griffith Energy Servs*., 426 Md. 134 (2012).

against the Defendants, even though as explained below, any claims are property of their bankruptcy estates subject only to rights of the Chapter 7 Trustee.

## ARGUMENT

**I.    PLAINTIFFS ARE PRECLUDED FROM BRINGING CLAIMS IN THIS ACTION DUE TO THE BANKRUPTCY PROCEEDINGS.**

Sens Mechanical, Roy Sens, and Melanie Sens failed to disclose this claim in their respective bankruptcy schedules, despite the fact that this pre-petition claim was known to them, and they and Sens, which Mr. and Mrs. Sens own, therefore lack standing to bring this action. Additionally, the Plaintiffs have waived, abandoned, and are judicially estopped from asserting any claims against Defendants.

### A.    Plaintiffs Lack Standing to Bring This Claim.

All claims asserted by Plaintiffs should be dismissed for lack of standing.  In 2017, Sens Mechanical, Roy Sens, and Melanie Sens sought and obtained relief under the Bankruptcy Code. In bankruptcy proceedings, a debtor has a statutory duty to disclose all of its legal and/or equitable interests, including potential claims and causes of action. *Zinkand v. Brown,* 478 F. 3d 634 (4th Cir. 2007).

When a debtor files for relief under the Bankruptcy Code, an estate is created that is comprised of "all legal or equitable interests of the debtor in property as of the filing date." 11 U.S.C. §§ 301-303. "Property of the estate includes all of the debtor's interests in any cause of action that has accrued prior to the bankruptcy petition." *Tignor v. Parkinson (In re Tignor)*, 729 F. 2d 977 (4th Cir. 1984). "If a cause of action is part of the estate of the bankrupt then the trustee *alone* has standing to bring that claim." *See*, *e.g., Wilson v. Dollar Gen. Corp*., 717 F.3d 337, 343 (4th Cir. 2013); *Viera v. Anderson*, 72 F.3d 772 (4th Cir. 2012) ("A trustee in bankruptcy succeeds to all rights the debtor, including the right to assert any causes of action belonging to

14

the debtor"). Property of the estate includes corporate assets, like Sens, that are wholly owned by the debtors. *See, e.g., In re Cumberland Enterprises, Inc.,* 22 B.R. 626, 631 (M.D. Tenn. 1982) (Court approves trustees pursuit of cause of action of non-debtor entity owned by debtor); *In re Modanlo*, 412 B.R. 715, 721-24 (Bankr. D. Md. 2006) (finding that trustee had authority to control wholly-owned non-debtor entity under corporate governance analysis), *aff'd*, 266 Fed. Appx. 272 (4th Cir. 2008); *In re B&M Land and Livestock, LLC*, 498 B.R. 262, 266-68 (Bankr. D. Nev. 2013) ("In a Chapter 7 bankruptcy, the trustee controls the property of the bankruptcy estate, all of Debtor's legal and equitable interests, including the right to control a" wholly owned company). A Chapter 7 trustee has the ability to exert control over companies that are wholly owed by the debtors. *See, e.g., In re Equimed, Inc.*, 2000 WL 1121555, *3 (D. Md. 2000) (holding that trustee can exert control over non-debtor business by replacing directors and officers of company); *In re Allard*, 2019 Bankr. LEXIS 2924, *1 (Bankr. S.D.N.Y. 2019).

Thus, Plaintiffs' claims are barred due to their lack of standing as the claims are property of the bankruptcy estates of Sens Mechanical and Mr. and Mrs. Sens. This is the case notwithstanding that they failed to properly schedule the claims they now assert. The Court of Appeals in *Adams v. Manown*, 328 Md. 463 (1992), held the trustee, not the debtor, was the real party in interest to bring a non-disclosed pre-petition claim, and the debtor, like Plaintiffs here, had no standing to bring the claim. *See also Bowie v. Rose Shanis Fin. Servs., LLC*, 160 Md. App. 227, 862 A.2d 1102 (2004) (Court affirmed that a potential claim was not abandoned by the estate where debtor had not listed the claim on his schedules, thus, remained property of the estate).

Here, Plaintiffs' claims are premised on the alleged pre-petition conduct of Defendants regarding alleged advice to walk off the Project, which occurred in August 2016. *See* Compl. ¶¶

33-35. Plaintiffs filed their bankruptcy petitions on June 21, 2017 and August 11, 2017, well after the Surety filed claims relating to the Project, and after the time that these Plaintiffs plainly knew or should have known of any cause of action that existed as to Defendants.  Accordingly, any such claim belongs to the bankruptcy estates, and only the Chapter 7 Trustee has standing to bring the claim.[3]

In *Miller*, the Fourth Circuit held that an undisclosed cause of action which accrued before the bankruptcy filing belonged to the estate, "render[ing] the bankruptcy trustee the only person with standing to pursue it." *Miller v. Pac. Shore Funding*, 92 F. App'x 933 (4th Cir. 2004). The Fourth Circuit dismissed the plaintiff's claim, holding that the plaintiffs lacked standing.  This Court should do the same, where Sens Mechanical and Roy and Melanie Sens' claims accrued well before their respective bankruptcy filings, yet they were not disclosed. By seeking to amend their bankruptcy schedules to include this claim now, Plaintiffs' concede they were prepetition claims that are property of their bankruptcy estates. *See* Bankruptcy Docket Sheets attached as **Exhibits 24 and 25**.

In addition, on July 1, 2019, Defendants and Sens, Roy and Melanie Sens, and Sens Mechanical entered into an agreement tolling the statute of limitations to December 1, 2019. *See* Tolling Agreement attached hereto as **Exhibit 26**. Subsequently, these parties agreed to an extension of the tolling agreement through March 1, 2020. Plaintiffs did not include the Chapter

---

[3] If a debtor "fails to list the cause of action as an asset of the estate in his schedules and this property was not administered before the case was closed . . . the asset was not deemed abandoned under §544 of the Bankruptcy Code at the time the case was closed. The cause of action, therefore, remains property of the estate under §554(d)." *In re Wilmoth*, 412 B.R. 791 (Bankr. E.D. Va. 2009); *see also Haydu v. Tidewater Cmty. College*, 268 F. Supp. 3d 843,848 (E.D. Va. 2017) ("a debtor may be precluded from pursuing claims about which [he or she] was aware of, but did not disclose during the bankruptcy proceedings").

7 Trustee as a party to the tolling agreement, despite the fact that this claim arose prepetition, and thus, the Trustee was the real party in interest.

Accordingly, where the statute of limitations for claims belonging to the Trustee was not extended through the tolling agreement, the Trustee remains bound by Maryland's three year statute of limitations which runs "from the date the alleged wrong was discovered or should have been discovered." *See Poffenberger v. Risser*, 290 Md. 631, 634-635 (1981) (discovery rule is "clearly applicable to all cases involving professional malpractice"). The claims in this matter are premised on alleged advice rendered by Defendants to walk off the Project, which occurred in August 2016. At the latest, the claims were known, or should have been known when IOOC made a claim on the bond, and the Surety entered into the takeover agreement with Whiting Turner on November 22, 2016. The Complaint in this matter was filed on February 28, 2020. Accordingly, where the Trustee is the real party in interest and no claims belonging to the Trustee were preserved through the tolling agreement, the statute of limitations has run and the claims are barred. Accordingly, this matter should be dismissed with prejudice.

**B.  Plaintiffs are Judicially Estopped from Bringing this Suit.**

Judicial estoppel is "a principle that precludes a party from taking a position in subsequent action inconsistent with a position taken by him or her in a previous action." *Dashiell v. Meeks*, 396 Md. 149, 170 (2006). The doctrine of judicial estoppel "rests upon the principle that a litigant should not be permitted to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise." *Mathews v. Gary*, 133 Md. App. 570, 579 (2000), *aff'd on other grounds*, 366 Md. 660 (2001) (quotation marks and citations omitted). Judicial estoppel ensures "the integrity of the judicial process by prohibiting

17

parties from deliberately changing positions according to the exigencies of the moment[.]" *Gordon v. Posner,* 142 Md. App. 399, 790 A.2d 675 (2002).

As noted in *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778 (9th Cir. 2001), judicial estoppel is used to "protect the integrity of the bankruptcy process." Courts have consistently held that parties are judicially estopped from "pursuing claims which [they] had knowledge of, but did not disclose during bankruptcy proceedings, and that a discharge of debt, by a bankruptcy court under these circumstances, is sufficient acceptance to provide a basis for judicial acceptance." *Id.; see also USinternetworking, Inc. v. Gen. Growth Mgmt. (In re USinternetworking, Inc.)*, 310 B.R. 274 (Bankr. D. Md. 2004) (Debtor's failure to disclose cause of action on bankruptcy schedules judicially estopped debtor from pursuing cause of action following confirmation of Chapter 11 plan); *In re Blair*, 319 B.R. 420 (Bankr. D. Md. 2005) (debtor could not escape estoppel effect of her prior inconsistent positions by belatedly amending schedules to include legal malpractice claim). The Ninth Circuit stated that "[j]udicial estoppel will be imposed when the debtor has knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy but fails to amend his schedules." *Hamilton,* 270 F.3d at 785.[4]

In *Chaney Enters. Ltd. P'ship v. Windsor*, 158 Md. App. 1, 854 A.2d 233 (2004) the Court of Special Appeals recognized three factors to be considered in applying the doctrine of judicial estoppel. *Id.* at 41. The present situation meets all three factors. The first factor is "whether the party's later position is clearly inconsistent with its earlier position;" the second factor is "whether the party succeeded in persuading the court in the earlier matter to accept its

---

[4] The Court of Appeals has also barred unscheduled claims under the "clean hands doctrine." *Adams v. Manown*, 328 Md. App. 463 (1992) (where a discharged debtor brought an unscheduled claim, court held that the equitable doctrine of "unclean hands" barred the claim).

position, so that judicial acceptance of the contrary position in the later matter would create the perception that one of the courts had been misled" and the third factor is "whether the party seeking to assert the inconsistent position in the later matter would derive an unfair advantage, or would impose an unfair detriment on the other party, from being permitted to do so." *Id*.

Here, none of the schedules filed prior to the closure of the bankruptcy proceedings identified any claim held by Plaintiffs against Defendants.  These Plaintiffs made representations to this Court through their bankruptcy schedules, signed under the penalties of perjury, that they and Sens possessed no causes of action against Defendants, and that the value of Sens was $1. The conduct of Mr. and Mrs. Sens is imputed to Sens by virtue of their positions with Sens. These Plaintiffs benefited from those representations and obtained bankruptcy discharges.[5]  The doctrine of judicial estoppel prevents Plaintiffs from benefiting from their "deliberately changing positions according to the exigencies of the moment." *See Chaney Enterprises* 158 Md. App. at 40. Defendants respectfully request that this Court find that Plaintiffs are judicially estopped from asserting these claims, and dismiss all claims asserted by these Plaintiffs with prejudice.

## II.  PLAINTIFFS CANNOT ESTABLISH THAT DEFENDANTS PROXIMATELY CAUSED THEIR ALLEGED DAMAGES

Plaintiffs cannot show that Defendants proximately caused their alleged damages, because, as a matter of law, Plaintiffs cannot demonstrate that they would have achieved a more favorable result in the absence of the alleged negligence.  In a legal malpractice action, a plaintiff must allege and prove: "(1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) loss to the client proximately caused by that neglect of duty." *Fishow v. Simpson*,

---

[5] Sens Mechanical had $12,210,921.85 in claims discharged without payment. *See* Ch.7 Trustee Final Account attached hereto as **Exhibit 27**. Roy and Melanie Sens' bankruptcy was deemed a "no asset" bankruptcy, and eventually settled with their creditors for $64,402.50.  *See* Order Approving Settlement attached hereto as **Exhibit 28.**

55 Md. App. 312 (1983); *Williams & Connolly v. Brown*, 84 Md. App. 640, 648 (1990). In this matter, Plaintiffs are unable to prove the third required element as a matter of law.

Maryland Courts have addressed the issue of proximate causation in attorney malpractice cases, consistently holding that if the alleged negligence did not put the Plaintiff in a worse position, then the alleged negligence was not the proximate cause of the harm. *See Williams & Connolly v. Brown*, *supra* (attorney's failure to timely record a deed of trust was not the proximate cause of the plaintiff's damages, since the plaintiff's interest, which would have been protected, was already subordinate to a tax lien on the property at issue, thus plaintiff would still be in the same position notwithstanding alleged negligence); *see also Thomas v. Bethea*, 351 Md. 513 (1998); *Catler v. Fox*, 212 Md. App. 685 (2013) (Court held Plaintiff could not prove proximate cause because a jury could not find "that it is more likely than not the plaintiffs could have obtained a more favorable result . . . .").

Plaintiff alleges damages for loss of anticipated profits from completion of the Project and due to the Surety's claim against Plaintiffs. Compl ¶ 51. Similar to *Catler, supra,* Plaintiffs cannot provide any explanation as to how their losses would have been stemmed or eliminated even if Defendants' alleged negligence did not occur. Sens was a sinking ship at the time of the alleged negligence, subject to liquidated damages, accruing daily. This situation was solely a result of Sens's delay in completing the Project, waiver of defenses arising from IOOC's failure to provide plans and permits, and refusal to complete the Project due to economic considerations. Given these undisputed facts, there can be no claim that Plaintiffs would have achieved a different and better result.

As Mr. Sens testified, Sens was expecting 8% profit on the Project (approximately $1.4 million). *See* **Exhibit 1** at 160:10-16. When Sens left the job, over a million dollars in liquidated

damages had already been assessed, and Plaintiffs, solely due to their own actions, had no defense against the assessed damages because Mr. Sens further testified that five days before Sens walked off the job, he conceded to Barry Gosnell "it would be impossible for me to do this job if you take over a million dollars from me" after Mr. Gosnell informed him that IOOC would be enforcing the liquidated damages provision. *See id.* at 197:11-21.

Additionally, if Sens had stayed on the job, they would have had to complete the job at significant cost, where the work was riddled with defects, including fire code violations, which cost millions of dollars to repair and complete.[6]  Indeed, testimony supports that the cost to repair and complete the project by the replacement contractor was $16 million. *See* **Exhibit 16** at No. 20. Accordingly, notwithstanding any alleged negligence, Sens is unable to demonstrate, as a matter of law, that it could have achieved any more favorable outcome.

Sens's assertion that it would have been able to successfully resolve its issues with IOOC without having to go out of business is unsupported, where Mr. Sens testified that it would be "impossible" for Sens to finish the project in light of the liquidated damages. Given that five days earlier Mr. Gosnell told Mr. Sens that he was going to continue to impose liquidated damages, Sens had waived all defenses to their claims through Change Order 12, and the job was, at that point, guaranteed to finish past the summer season, Sens was decidedly unable to avoid the damages that it and its co-Plaintiffs incurred.

For all of these reasons, Plaintiffs are unable to prove damages proximately caused by alleged negligence by Defendants, and accordingly, Plaintiffs' claims are barred.

---

[6] Defendants also note that prior to the Project, Sens had a negative net worth, negative working capital, high bank debt, and no lines of credit.  *See* **Exhibit 6** at 11:10, 18:14-19.

## III.   PLAINTIFFS' CLAIMS ARE BARRED BY CONTRIBUTORY NEGLIGENCE.

Plaintiffs' repeated failures to protect their own interests, during the negotiation of the Contract, the Amended Contract, and during the performance of the contract, caused the damages which Plaintiffs now assert. These actions by Plaintiffs bar their claims in their entirety. As set forth below, Sens, through its representatives Roy Sens and Dave Rainey, exhibited a reckless disregard for the terms they agreed to with the Owner. Plaintiffs' own negligence resulted in the accrual of substantial liquidated damages and Sens's waiver of any defenses related to deficient or incomplete design documents as agreed in Change Order 12.  In addition, Sens, through its own faulty workmanship, significantly contributed to the amount of the bond claim, and as a result, the damages claimed in this action.

In Maryland, "[a] plaintiff who fails to exercise ordinary care for his own safety is contributorily negligent and is barred from all recovery, regardless of the quantum of a defendant's primary negligence." *Harrison v. Montgomery Cty. Bd. of Educ*., 295 Md. 442, 452 (1983) "Contributory negligence occurs when the injured party acts or fails to act in a manner consistent with the knowledge or appreciation, actual or implied, of the danger involved." *See* MPJI-Cv 19:12; *see also Campbell v. Montgomery Cty. Bd. of Educ*., 73 Md. App. 54 (1987). The Court of Appeals in *Wegad v. Howard Street Jewelers, Inc.,* 326 Md. 409, 417 (1992) held that, "the focus of contributory negligence defense is whether the Plaintiff took appropriate precautions to protect his own interests." "In measuring contributory negligence, the standard of care imposed on a person for his or her own protection is that of a reasonable person under like circumstances, and that a person's conduct' is to be judged in the light of all the relevant knowledge which the person actually then had." *Kassama v. Magat*, 368 Md. 113 (2002). "[T]o be held contributorily negligent; a person must actually have been aware or should have

appreciated the risks involved and then failed to exercise reasonable and ordinary care for his own protection." Thus, "whether the plaintiff should have appreciated the risks or foreseen the potential harm to himself becomes a central question in the analysis." *Wegand* at 418.

Here, Plaintiffs assert that Defendants' were negligent in advising Sens to walk off the job causing Sens to lose profits, business value of both Sens and Sens Mechanical, and income and assets by Roy and Melanie Sens. *See* Compl. ¶ 51. However, the undisputed facts demonstrate that it was in fact Plaintiffs' own negligence that resulted in these damages.

### 1. Sens Was Contributorily Negligent by Agreeing to Exhibit I and Change Order No. 12.

As set forth above, Sens, without conferring with counsel, agreed to Exhibit I, which stated that Sens acknowledged deficient and/or incomplete design documents, and that all work necessary to implement the Project would be done at no additional expense to the Owner, notwithstanding the deficiencies in design documents. Stated differently, Sens agreed to assume all risks of additional cost and expense relating to the Project, without even seeing completed design plans. Moreover, in June 2016, Sens agreed to Change Order 12 which reinforced the language of Exhibit I, and under which Sens waived and released IOOC "from any and all claims, demands, requests for additional time, … in any way connected with… alleged errors, omissions or other deficiencies in the design documents supplied by the Owner." *See* **Exhibit 13**.

Mr. Lockhart, a construction professional with Whiting Turner, testified that "there is no way any legitimate real thinking general contractor would sign off on Exhibit I. The only way it could happen is if someone made a mistake… because he does not—he cannot physically do it. If they agreed to Exhibit I knowingly, then they made a huge mistake." *See* Deposition of Robert Lockhart attached hereto as **Exhibit 29** at 115:7-117:19; 137:16-19.

**a. Plaintiff Was Aware of the Danger Involved with Deficient Documents.**

Sens was formed in 2011, and has constructed multiple large hotel projects in the Ocean City area including the Hampton Inn in Rehoboth Beach, Delaware. *See* **Exhibit 1** at 276:6-266:15. Sens was aware of the importance of accurate and complete design documents and drawings. However, at the time Sens signed the Amended Contract, including Exhibit I, they had only been provided approximately thirty percent of the design documents. *See id.* at 130:20-21. In general, when a contractor agrees to a "gross maximum price provision" such as Exhibit I, "the documents are 100 percent complete." **Exhibit 18** at 61:21-62:2.

**b. Sens was Informed by Defendants that Change Order No. 12 Was Problematic**

Sens was expressly informed by Mr. Beach that it should not enter into Change Order 12. After receiving a copy of the proposed Change Order 12, Mr. Beach warned Sens: "I am not satisfied with the document. On my calendar 31 May was last Monday.  What about the elephant in the room, the missing plans, specs, and permits? No [liquidated damages] until a new completion dates some reasonable time after receipt of missing documents and permits. No waiver of Sens rights. Stop work until resolved. You are being played." **Exhibit 14** (emphasis added).

Despite this warning, and against the advice of counsel, Mr. Sens signed Change Order 12 on June 9, 2016, approximately 10 days after the new date of substantial completion. Mr. Sens *knew* that Sens was not going to be able to finish the project by May 31, 2016, yet he still signed the document, guaranteeing that liquidated damages would continue to be assessed. *See* **Exhibit 1** at 255:19-21; *see also Conklin v. Hannoch Weisman*, 145 N.J. 395 (1996) (if a client or patient deliberately violates the professional's instructions with respect to self-care or heedlessly enters a transaction regardless of any instructions on the part of the professional, the

trier of fact may find that there is no causal connection between the fault and the harm). Notably, on August 2, 2016, in responding to allegations from Sens regarding defective or missing design documents, IOOC cites Exhibit I and Change Order 12, and states that "every issue you referenced existed prior to the effective date of Change Order Number 12" and is therefore, waived. *See* **Exhibit 5**.

It is clear from Plaintiffs' actions in agreeing to the Project, and assuming all risk of cost associated with unfinished design documents, and through execution of Change Order 12 ***against the advice of Defendants,*** that Plaintiffs "(1) had knowledge of the risk of danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *S & S Oil, Inc. v. Jackson,* 428 Md. 621, 644 (2012). Accordingly, Plaintiffs are barred from recovery as a matter of law.

    2. **Sens, Through Its Own Negligence, Contributed to its Damages**.

After Whiting Turner took over the job, it discovered that Sens's work on the Project was negligent and deficient, which contributed significantly to the cost and work required to complete the Project. Robert Saxman of Whiting Turner testified that "after having toured the job, it was obvious to ourselves and to Richard Klein that there were extensive issues with the construction of the project." *See* **Exhibit 18** at 39:11-16. As Whiting Turner began completion of the project, "it became more and more clear, that the level of defect in construction was extensive and some of it was hidden." *Id*. at 65:8-11. The defects included extensive mechanical issues, firestopping, concrete in the stairwells, and walls not wide enough to meet code. *Id.* at 42:10-44:5, 68:5-11, 78:10-14.

In addition, "there were certainly parts of the work not done. The site work was largely undone. There was lots of work on the pool. The whole exterior pool/tiki bar area had barely

started. There were issues in quality in drywall. There were issues in some of the concrete work in the stairwells. [Whiting Turner] had been informed that the walls—the stairs were not wide enough to meet code." *Id.* at 43:6-43:14. The alleged "exorbitant costs" alleged by Plaintiffs in the Complaint are a result of Plaintiffs' own deficient construction work. *See* Compl. ¶ 35.  For example, due to the mechanical and ductwork issues, much of the lines had to be replaced. As a result, "almost all the ceilings in the hallways had to be removed to access those lines and reinsulate." **Exhibit 18** at 74:3-16 (Rob Sax Depo). As a result, an $18 million project that was approximately 85-90 percent complete, cost the Surety close to $16 million to repair and complete as a result of Sens's defective construction. *See* **Exhibit 16** at No. 20. Accordingly, Plaintiffs' negligence in the construction of the project and refusing to perform contributed significantly to the amount of damages. Accordingly, their claims are barred by the doctrine of contributory negligence.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court dismiss the Complaint, in its entirety, with prejudice.  Alternatively, Defendants respectfully request that the Court grant Court summary judgment in favor of the Defendants as to all claims.

Respectfully submitted,

| | |
|---|---|
| */s/ Alvin I. Frederick* | */s/ Lauren E. Marini* |
| Alvin I. Frederick (01429) | Lauren E. Marini (30057) |
| ECCLESTON & WOLF, P.C. | ECCLESTON & WOLF, P.C. |
| Baltimore-Washington Law Center | Baltimore-Washington Law Center |
| 7240 Parkway Drive, 4th Floor | 7240 Parkway Drive, 4th Floor |
| Hanover, MD 21076-1378 | Hanover, MD 21076-1378 |
| (410) 752-7474 | (410) 752-7474 |
| (410) 752-0611 (fax) | (410) 752-0611 (fax) |
| E-mail: frederick@ewmd.com | E-mail: marini@ewmd.com |
| *Attorney for Defendants* | *Attorney for Defendants* |

/s/ Kevin G. Hroblak
_____
Kevin G. Hroblak (26180)
WHITEFORD TAYLOR PRESTON L.L.P.
7 St. Paul Street
Baltimore, MD  21202
(410) 347-9405(phone)
(410) 223-4305 (fax)
E-mail: khroblak@wtplaw.com
Attorney for Defendants


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of May, 2020, copies of the foregoing

Memorandum of Law in Support of Defendants' Motion to Dismiss, or in the Alternative,

Motion for Summary Judgment was served by the Court's ECF System to:


Christopher G. Hoge, Esquire
1211 Connecticut Avenue, NW
Suite 300
Washington, DC  20036
*Counsel for Plaintiffs*

Wes P. Henderson, Esquire
Patrick D. Gardiner, Esquire
Henderson Law, LLC
2127 Espey Court
Suite 204
Crofton, MD  21114
*Counsel for Plaintiffs*


/s/Lauren E. Marini
_____
Lauren E. Marini (30057)